IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-01811-WJM-CBS

TANYA L. PAIGE,
        Plaintiff,
v.

SHAUN DONOVAN, Secretary United States Department of Housing and Urban
Development,
        Defendant.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Craig B. Shaffer

        This civil action comes before the court on "Defendant's Motion for Summary

Judgment and Supporting Brief" (filed November 10, 2010) (Doc. # 96).  Pursuant to the

Order of Reference dated August 5, 2009 (Doc. # 4) and the memorandum dated

November 10, 2010 (Doc. # 97), this matter was referred to the Magistrate Judge.

        Ms. Paige commenced this action on July 31, 2009 in her *pro se* capacity,

alleging racial and religious discrimination in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e-5 ("Title VII") against two of her supervisors, Karen Kay

Baker and Cynthia L. Loftus, and the Secretary of the Department of Housing and

Urban Development ("HUD"), Shaun Donovan.  (See "Title VII Complaint" (Doc. # 1)).

Ms. Paige filed her Amended Complaint on August 13, 2009, alleging "Discrimination on

the basis of Race, Religion, Sex, and Color" under Title VII and intentional infliction of

emotional distress "under the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b)."  (*See*

Amended Complaint ("AC") (Doc. # 8)).  The United States was substituted for

1

Defendants Baker and Loftus on November 12, 2009.  (*See* "Unopposed Motion for Substitution" (Doc. # 26); "Courtroom Minutes/Minute Order" (Doc. # 28)).  On May 10, 2010, Ms. Paige's claim for intentional infliction of emotional distress and the United States of America were dismissed from the case.  (*See* "Order Accepting Magistrate Judge's Recommendation" (Doc. # 67)).  Counsel entered her appearance for Ms. Paige on February 10, 2011.  (*See* Doc. # 117)  The court has reviewed the Motion, Ms. Paige's Amended Response ("Response") (filed March 30, 2011) (Doc. # 122), Defendant's Reply (filed April 29, 2011) (Doc. # 123), the exhibits and affidavits, the entire case file, and the applicable law and is sufficiently advised in the premises.

I.     Standard of Review

Defendant moves for summary judgment on the remaining claims in the Amended Complaint pursuant to Fed. R. Civ. P. 56(c).  Summary judgment is proper "when there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> . . . Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.
>
> A fact is material if it pertains to an element of a claim or defense; a factual dispute is genuine if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. The court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.
>
> The analysis to be applied on a motion for summary judgment differs depending on whether the moving party is also the party with the burden of proof at trial. Where, as here, the non-movant bears the burden of proof at trial, the non-movant must point to specific evidence establishing a genuine issue of material fact with regard to each challenged element.

2

*Allen v. Reynolds*, 2011 WL 2174424 * 1-2 (D. Colo. June 3, 2011) (internal quotation marks and citations omitted).

Defendant also moves, pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss all claims for which Ms. Paige failed to exhaust administrative remedies.  Defendant's assertion of failure to exhaust administrative remedies constitutes a challenge to the allegations of subject matter jurisdiction in the AC.  Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir.1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.1974). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction."  *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir.1971).  Ms. Paige bears the burden of establishing that this court has subject matter jurisdiction over her claims.  *See Basso*, 495 F.2d at 909.


II.    Undisputed Facts

At all times relevant to her claims, Ms. Paige was a GS-13 Senior Housing specialist in branch 2 of the Quality Assurance Division, Denver Home Ownership Center, of HUD.  (*See* Declaration of Karen Kay Baker, Exhibit A-1 to Motion (Doc. #

96-1) at ¶ 2).  Ms. Baker has been the Director of the Quality Assurance Division since April 2004.  (*See id.* at ¶ 1).

HUD uses a 5 tier scale for ratings its employees.  The ratings from best to worst are Outstanding, Highly Successful, Fully Successful, Marginally Successful and Unacceptable.  (*See* Doc. # 96-1 at ¶ 5).  For many annual performance periods between 1993 and 2004, Ms. Paige's overall Performance Rating was "Outstanding." (*See* Performance Appraisals, Doc. # 122, Exhs. 2–8).  For the performance period from February 1, 2004 to January 31, 2005, Ms. Paige's overall Performance Rating was "Highly Successful."  (*See id.* Ex. 9).  For the performance period from February 1, 2005 to January 31, 2006, Ms. Paige's overall Performance Rating was "Fully Successful."  (*See id.* Ex. 10).  For the performance period from February 1, 2006 to September 30, 2006, Ms. Paige's  overall Performance Rating was again "Fully Successful."  (*See* Doc. # 122, Ex. 27).

During each performance period, HUD does a mid-year progress review of all employees. The mid-year progress review notifies the employee of his/her performance, affording the employee an opportunity to improve performance where needed.  (*See* Doc. # 96-1 at ¶ 13;  Doc. # 96-4 at ¶¶ 4, 5).  On July 2006, Ms. Loftus conducted Ms. Paige's mid-year review after receiving input from Mr. Neff.  (*See* Doc. # 122, Ex. 16, at 10, 53).  In May 2006 Ms. Paige's supervisor, Mr. Neff, prepared a draft progress review for Ms. Paige.  (*See* Doc. # 122, Ex. 17, at 23).  On or about June 26, 2006 Ms. Loftus and Ms. Baker initiated a call to Mr. Neff to discuss Ms. Paige's performance.  (*See* Doc. # 122, Ex. 16, at 12-13,18-21).  Ms. Baker raised the possibility of giving Ms. Paige an "Unsatisfactory" rating and issuing Ms. Paige a Performance Improvement Plan.

(*See* Doc. # 122, Ex. 17, at 31).   Mr. Neff did not recommend any "unsuccessful" ratings.   (*See* Doc. # 122, Ex. 16, at 54; Ex. 17, at 24).   On July 26, 2006 Ms. Paige's mid-term review was administered with a rating of the lowest possible level of "Unacceptable" on two critical elements and "Marginally Successful" on two other critical elements.   (*See* Doc. # 122, Exhs. 23, 24;   Doc. # 96-1 at ¶ 13;   Doc. # 96-4 at ¶ 5).   On August 14, 2006, Ms. Paige was placed on a 60-day Opportunity to Improve/ Performance Improvement Plan (OIP/PIP).   (Ex. 24).

Ms. Paige initially contacted a HUD Equal Employment Opportunity ("EEO") counselor on August 2, 2006.   (*See* Doc. # 96-2 at 4 of 17).   Ms. Paige later indicated her intention "to include Retaliation based upon the October 4, 2006, PIP." (*See* Doc. # 122, Exh. 12).   She filed a formal EEO complaint on November 16, 2006 that she had been subjected to disparate treatment and a hostile work environment based on race (African-American), alleging: (1) she was placed on a Performance Improvement Plan ("PIP") on October 4, 2006; (2) she was placed on a Opportunity to Improve Performance/Performance Improvement Plan("OIP/PIP") on August 14, 2006; (3) she was issued an "Unacceptable" rating during a mid-year progress review on July 12, 2006, and she received lower performance appraisals after Kay Baker was appointed Division Director; (4) she was not given the opportunity to serve as Acting Branch Chief and was not assigned special projects; and (5) she had been excluded from impromptu staff meetings conducted at employee cubicles.   (*See* Declaration of Jerry Holloway, Exhibit A-2 to Motion (Doc. # 96-2) at 2 of 17, ¶ 3;   EEO Complaint of Discrimination in HUD (Doc. # 96-2) at 4-11 of 17).

On May 10, 2007, Ms. Paige amended her EEO complaint to include claims that

she was retaliated against when her supervisor Michael Depew incorrectly processed her request for religious compensatory time, and when he sent her an offensive e-mail communication. (*See* Doc. # 96-2 at 2 of 17, ¶ 4;  Doc. # 96-2 at 8,10 of 17;  *see also* Doc. # 122, Exh. 13).  While the EEOC did not accept this allegation as a separate claim, it accepted Ms. Paige's amendment "as background evidence to support her current claim of a hostile work environment."  (*See* Doc. # 122, Exhs. 11, 13). On May 12, 2009, Ms. Paige received a letter from the EEOC informing her that she had "failed to prove that she was subjected to discrimination" but granting her permission to sue. (*See* Complaint (Doc. # 2) at 8 of 9).

On September 15, 2006, Ms. Paige was taken off the OIP/PIP because her performance had improved and she was performing at the "Fully Successful" level for critical elements 3, 4, and 7.  (*See* Doc. # 96-1 at ¶ 15;  Doc. # 96-4 at ¶ 8).  In October 2006 Ms. Paige was put on a PIP that was related to one critical area, technical advice. The determination of the need for a PIP was within "the discretion of the supervisor." (*See* Doc. # 122, Ex. 14, at 86).  Ms. Baker was the ultimate decision maker on Ms. Paige's ratings.  (Ex. 14, at 69–70).  On November 24, 2006 Ms. Paige was given a "Fully Successful" rating.  (*See* Doc. # 122, Ex. 14, at 96– 97; Ex. 27;  Doc. # 109, Exh. 3 at 97). At the mid-year progress review in April of 2007 Mr. Depew added the element of "correspondence" to Ms. Paige's PIP.  (*See* Doc. # 122, Ex. 15, at 7– 8).  The PIP was terminated in November 2007.  (*See* Doc. # 109, Exh. 3 at 91).

During the early part of 2006, the permanent Branch Chief position for branch 2 of the Quality Assurance Division was vacant.  Douglas Neff was appointed "by Jane Hall and the home ownership center director" to serve as Acting Branch Chief from

6

February 27, 2006 through May 26, 2006.  (*See* Doc. # 96-1 at ¶ 6;  Declaration of

Douglas Neff, Exhibit A-3 to Motion (Doc. # 96-3) at ¶¶ 2, 3;  Doc. # 109, Exh. 3 at 18 of

124).  Mr. Neff received an "Outstanding" rating for the rating cycle that ran from

February 27, 2005 through January 31, 2006.  (Doc. # 96-3) at ¶ 4).

 When Ms. Baker needed to select the next Acting Branch Chief, she consulted

the Office of Human Resources and decided to ask reviewers in the unit to serve as

Acting Branch Chief on a rotating basis.  (*See* Doc. # 96-1 at ¶ 4).  Ms. Baker decided

to "begin with the reviewer staff that had the highest ratings, beginning at the top of the

row of the reviewers."  (*See* Doc. # 122, Exh. 14, at 23).  When referring to the "top"

row, Ms. Baker was indicating physical location where individuals actually sat in the first

row. (*See* Doc. # 122, Exh. 14, at 29;  Doc. # 109, Exh. 3 at 24-30 of 124).  Ms. Baker

looked at performance ratings for the period ending December 30, 2005.  (*See* Doc. #

122, Ex. 14, at 23;  Doc. # 109, Exh. 3 at 23 of 124).

 Ms. Baker appointed Ms. Loftus, a reviewer in branch 2, as the Acting Branch

Chief from May 28, 2006 through September 24, 2006.  (*See* Doc. # 96-1 at ¶ 7;

Declaration of Ms. Loftus, Exhibit A-4 to Motion (Doc. # 96-4) at ¶¶ 2, 3; Doc. # 122, Ex.

16, at 7, 10).  Ms. Loftus received an "Outstanding" rating on February 28, 2006.  (*See*

Doc. # 96-4 at ¶ 3).  Ms. Baker approached Ms. Loftus and asked her if she would be

willing to accept the position as Acting Branch Chief.  (*See* Doc. # 122, Ex. 16, at 7).

Ms. Loftus received a pay increase while acting as Branch Chief.  (*See* Doc. # 122, Ex.

16, at 7–8;  Doc. # 109, Exh. 3 at 102-03).

 Ms. Baker appointed Paul Denton as the Acting Branch Chief from September

25, 2006 through November 10, 2006.  (*See* Doc. # 96-1 at ¶ 8;  Declaration of Paul

Denton, Exhibit A-5 to Motion (Doc. # 96-5) at ¶¶ 2, 3).   Mr. Denton received a "Highly

Successful" rating on March 8, 2006.  (*See* Doc. # 96-5 at ¶ 3;  Doc. # 122 Exh. 31).   In

June 2006 Mr. Denton received an "Outstanding" rating in every category of his

Performance Review. (Ex. 14, at 108–110).   Michael Depew was selected as the

permanent branch 2 Chief effective November 2006.  (*See* Doc. # 96-1 at ¶ 9;

Declaration of Michael Depew, Exhibit A-6 to Motion (Doc. # 96-6) at ¶ 3).

On February 1, 2007, Ms. Paige applied for religious compensatory time off for

April 5 and 6, 2007.  (*See* Doc. # 96-6 at ¶ 5;  *See* Doc. # 122, Ex. 19, Ex. 15, at 16).

When she applied, Ms. Paige had not yet earned 16 hours of compensatory time by

working extra hours.  (*See* Doc. # 96-6 at ¶ 5).   On March 15, 2007, Mr. Depew sent

Ms. Paige an e-mail advising her that she needed to earn 10.75 additional hours of

compensatory time prior to the scheduled leave.  (*See id.* at ¶ 6;  Doc. # 122, Exh. 20).

Mr. Depew forwarded a copy of the March 15, 2007 e-mail to the agency time-keeper,

Debbie Briceno.  (*See* Doc. # 96-6 at ¶ 6).   Ms. Briceno advised Mr. Depew that HUD

policy allowed Ms. Paige to earn religious compensatory time within 13 weeks after the

scheduled leave and that Ms. Paige had earned 8 additional hours of compensatory

time and only needed 2.75 additional hours.  (*See* Doc. # 96-6 at ¶ 7,  6 of 8).   On

March 16, 2007, Mr. Depew advised Ms. Paige that his e-mail of March 15, 2007 was

incorrect; that she had until 13 weeks after the leave to earn the religious compensatory

time; and that he had confused the religious compensatory time policy with the credit

hour policy.  (*See* Doc. # 96-6 at ¶¶ 8, 9).   Mr. Depew approved 16 hours of

compensatory leave on March 30, 2007.  (*See* Doc. # 96-6 at ¶ 7 and 4-6 of 8).   Ms.

Paige was continuing to earn the additional hours in January of 2008.  (*See* Doc. # 122,

Exh. 15 at 16).

On March 19, 2007, Mr. Depew sent Ms. Baker an e-mail in response to her request for an update on Ms. Paige's training.  (*See* Doc. # 96-6 at ¶ 10 and 7-8 of 8).  Mr. Depew forwarded a copy of the March 19, 2007 e-mail to Ms. Paige.  In response, Ms. Paige sent Mr. Depew an e-mail asking why Ms. Baker was sent the e-mail about her.  (*See id.*).  On March 19, 2007, Mr. Depew answered that it was not Ms. Paige's position to question why managers communicate.  (*See* Doc. # 96-6 at ¶ 11 and 7-8 of 8).

On September 5, 2008, Ms. Loftus granted Ms. Paige permission to take 32 hours of religious compensatory time for Kwanzaa from December 26, through December 31, 2008, but also requested that Ms. Paige resubmit her extra work request and provide specific dates and times when she would work extra time.  (*See* Doc. # 96-3 at ¶ 10).  On October 20, 2008 Ms. Paige, through her union, filed a grievance regarding Ms. Loftus' handling of her religious compensatory time requests.  (*See* Employee Grievance, Exhibit A-7 to Motion (Doc. # 96-7);  Doc. # 122, Exh. 22).  On February 6, 2009, Ms. Paige's union grievance was resolved at Step 3 of the union grievance process.  (*See* Step 3 Management Response to Tanya Paige Grievance, Exhibit A-8 to Motion (Doc. # 96-8).

On November 1, 2008, Ms. Paige filed a formal EEO complaint alleging that she was discriminated against on the basis of race, color, religion (Kwanzaa) and in retaliation for engaging in protected activity when Ms. Loftus requested a specific schedule of when she would work the extra hours to earn the religious compensatory time.  (*See* Doc. # 96-2 at ¶ 6 and 12-15 of 17).  On December 22, 2008, HUD

dismissed Ms. Paige's EEO complaint pursuant to 29 C.F.R § 1614.107(a)(4) because she had raised the issue in the union grievance.  (*See* Doc. # 96-2 at ¶ 6).[1]  Ms. Paige retired from her federal employment with HUD on May 1, 2009, at a pay rate of over $94,000.  (*See* Doc. # 96-1 at ¶ 3;  Doc. # 122 at 18 of 36).

IV.     Analysis

A.     Failure to Exhaust Administrative Remedies

A plaintiff who alleges discrimination by an executive agency must first consult with an EEO counselor "prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a).  Contact must be initiated with the EEO counselor "within 45 days of the date of the matter alleged to be discriminatory."  *Id.* § 1614.105(a)(1).  Exhaustion of administrative remedies is a jurisdictional prerequisite for a federal employee asserting an employment discrimination claim.  *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996).  *See also Jones v. United Parcel Service, Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) ("In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit.") (citation omitted).  Ms. Paige has the burden of proving that she exhausted administrative remedies on her claims.  *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1105 (10th Cir. 2002).  To meet this jurisdictional requirement, a plaintiff's claim in court must have been stated in an EEO

---

[1]     29 C.F.R. § 1614.107(a)(4) provides that "the [EEO] shall dismiss an entire complaint: . . . [w]here the complainant has raised the matter in a negotiated grievance procedure that permits allegations of discrimination[.]"  *See also Tucker v. Astrue*, 738 F. Supp. 2d 835, 839 (N.D. Ill. 2010) ("since Plaintiff chose to use the grievance process, he is foreclosed from pursuing his claims through the EEO process or through a separate complaint to the EEOC.").

complaint and resolved at the administrative level of the case.  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1166 (10th Cir. 2007).

In determining whether a plaintiff has exhausted his or her administrative remedies, the court must "determine the scope of the allegations raised in the EEOC charge because [a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Jones*, 502 F.3d at 1186 (internal quotation marks and citation omitted).  Charges filed with the EEOC are liberally construed in determining whether administrative remedies have been exhausted as to a particular claim.  *Jones*, 502 F.3d at 1186 (citations omitted).  Nevertheless, the "inquiry is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory *acts* alleged in the administrative charge."  *Jones*, 502 F.3d at 1186 (emphasis in original).   "In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; . . ."  *Id.*

A Title VII plaintiff must exhaust his or her administrative remedies for each individual discriminatory or retaliatory act.  *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court clarified that contact with an EEO counselor is required within 45 days of each discrete discriminatory action and that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."  *Martinez*, 347 F.3d at 1210 (citing *Morgan*, 536 U.S. at 114) (internal quotation marks omitted).  "Each discrete incident of [discriminatory] treatment constitutes its own unlawful employment practice for which

11

administrative remedies must be exhausted." *Martinez*, 347 F.3d at 1210.

Ms. Paige alleges that she filed a Charge of Discrimination with the EEOC on November 16, 2006.  (*See* AC (Doc. # 8) at p. 2, ¶ 11;  *see also* Doc. # 2 at p. 4 of 9). In her Charge of Discrimination, Ms. Paige marked only the box "Race" and noted "African American" as the basis for the alleged discrimination.  (*See* Doc. # 2 at p. 4 of 9).  "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box."  *Jones*, 502 F.3d at 1186 (citation omitted).  "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim."  *Id.*  In the text of her charge, Ms. Paige identified in detail disparate treatment based on race, including placement on a 60-day OIP/PIP on August 14, 2006, a July 12, 2006 progress review, failure to appoint her as acting supervisor, and exclusion from impromptu meetings at co-workers' cubicles.  (*See* Doc. # 2 at p. 4 of 9).

"The requirement that a Title VII claimant exhaust administrative remedies serves the purpose of giving the agency the information it needs to investigate and resolve the dispute between the employee and the employer."  *Khader v. Aspin*, 1 F.3d 968, 971 (10th Cir. 1993) (internal quotation marks and citation omitted).  Courts have held that a plaintiff exhausted claims not specified in the charge where it was clear that the EEOC would be aware of those claims during the course of investigating the charge.  For example, in *Foster v. Ruhrpumpen, Inc.*, the court held that the plaintiffs had exhausted their failure to hire claims, as the defendant "could discern from the charges filed that the plaintiffs were accusing the company of age discrimination" and "the EEOC could quite easily have discovered in the course of investigating the plaintiffs' allegations that

12

while not terminated . . . the plaintiffs were in fact not hired."  365 F.3d 1191, 1196 (10th

Cir. 2004).  In *Test v. Holder*, the court held that the plaintiff had exhausted certain

retaliation claims by presenting them to the EEOC during the course of its investigation

into separate but related claims.  614 F. Supp. 2d 73, 83 (D.D.C. 2009).  In *Wiley v.*

*Glassman*, the court found error by dismissing an employee's retaliation claim on the

basis that it was not specifically listed in her formal administrative complaint.  511 F.3d

151, 160 (D.C.Cir. 2007).  The court ruled that the employee's allegation that her

employer had reduced the amount of broadcast airtime she was responsible for

producing reasonably grew out of her other allegations that her employer had denied

her career advancement and promotional opportunities.  *Id.*

The EEOC interpreted Ms. Paige's Complaint to allege that "she was subjected

to disparate treatment and subjected to a hostile work environment on the basis of race

(African-American) and reprisal (prior EEO activity). . . ."  (*See* EEOC Investigation

Report, Doc. # 122, Exh. 11;  *see also* Doc. # 122, Exh. 29;  Doc. # 96-2 at p. 2 of 17, ¶

3).  On May 10, 2007, Ms. Paige amended her EEO complaint to include claims that

she was retaliated against when her supervisor Michael Depew incorrectly processed

her request for religious compensatory time, and when he sent her an offensive e-mail

communication. (*See* Doc. # 96-2 at p. 2 of 17, ¶ 4;  EEO Complaint of Discrimination in

HUD (Doc. # 96-2) at pp. 12-17 of 17;  *see also* Doc. # 122, Exh. 13).  At the time of the

EEOC investigation and Ms. Paige's amendment, Ms. Paige was represented by

counsel.  (*See, e.g.*, Doc. # 122, Exhs. 11, 13).  The EEOC accepted Ms. Paige's

amendment "as background evidence to support her current claim of a hostile work

environment." (*See* Doc. # 122, Exh. 11).  The EEOC explicitly addressed Ms. Paige's

13

complaints of disparate treatment and a hostile work environment based on race and retaliation based on prior EEO activity.  The court concludes that Ms. Paige has exhausted her claims for disparate treatment and a hostile work environment based on race and retaliation based on prior EEO activity.

However, neither of Ms. Paige's EEO complaints included any allegations regarding constructive retirement or discharge (as alleged in the Prayer for Relief ¶ 3 (Doc. # 8)), gender discrimination, or that she was discriminated or retaliated against by not being reassigned to another division (as alleged in paragraph 25 of the AC).  Ms. Paige does not argue that she has exhausted her claim for failure to reassign her to another division.  Ms. Paige argues that her second EEO complaint satisfies the exhaustion requirement as to gender and religious discrimination.  (*See* Doc. # 122 at p. 16 of 36).  Yet nowhere in either of her EEO complaints does Ms. Paige mention gender discrimination.  (*See* Doc. # 96-2 at pp. 12-16 of 17;  Doc. # 2 at pp. 4-7 of 9;  Doc. # 122, Exh. 13).  Because Ms. Paige's claim for religious discrimination based on her "July 18, 2008 request to earn and take Religious Compensatory Time to recognize Kwanzaa" was dismissed pursuant to 29 C.F.R § 1614.107(a)(4) as foreclosed by raising the claims in her union grievance, the court lacks jurisdiction over such claim. *See Wong v. Barnhart*, 2006 WL 1719530 * 1 (N.D. Ill. 2006) (dismissing for lack of subject matter jurisdiction discrimination claims based on EEO complaint that was "on the same matter" as union grievance);  *Crowell v. Lahood*, 201 WL 147913 * 3 (S.D. Tex. 2011) (granting motion to dismiss for lack of subject matter jurisdiction where federal employee plaintiff was bound by his election in filing a union grievance and failed to exhaust his administrative remedies).

14

Ms. Paige argues that a reference in the EEO Investigation Report supports a conclusion that she exhausted her administrative remedies as to her constructive retirement or discharge claim.  (*See* Doc. # 122 at pp. 15-16 of 36;  Doc. # 122, Exh. 11 ("the Complainant requests . . . an end to the discrimination against her, which includes discipline and attempts to force her to retire. . . .")).  Ms. Paige's first EEO complaint was filed on November 16, 2006, more than two years before her retirement on May 1, 2009, and makes no mention of constructive retirement or discharge.  (*See* Doc. # 96-2 at pp. 4-7 of 17).  Ms. Paige's amendment to her November 16, 2006 EEO complaint does not mention constructive retirement or discharge.  (*See* Doc. # 96-2 at pp. 8, 10 of 17).  Ms. Paige's second EEO complaint was filed on November 1, 2008, six months before her retirement on May 1, 2009, and makes no mention of constructive retirement or discharge.  (*See* Doc. # 96-2 at pp. 12-15 of 17).  Ms. Paige presents no evidence that she contacted an EEO counselor within 45 days of her retirement date or filed any EEO complaint alleging constructive retirement or discharge after she retired.  Despite the passing reference in the EEO Investigation Report to Ms. Paige's request for "an end to the discrimination against her, which includes discipline and attempts to force her to retire. . ." (*see* Doc. # 122, Exh. 11), this claim cannot be deemed to arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination.  *Jones*, 502 F.3d at 1186.  *See also Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164, 174 (10th Cir. Jan. 12, 2009) ("a claim of constructive discharge requires filing an administrative charge") (citation omitted).  The court concludes that Ms. Paige failed to exhaust any claim for constructive retirement or discharge.

In sum, Ms. Paige's claims for constructive retirement or discharge, gender

discrimination, that she was discriminated or retaliated against by not being reassigned to another division (as alleged in paragraph 25 of the AC), or religious discrimination based on her "July 18, 2008 request to earn and take Religious Compensatory Time to recognize Kwanzaa" (as alleged in paragraph 31 of the AC (Doc. # 8); *see also* Doc. # 96-2 at p. 12 of 17) are properly dismissed for lack of subject matter jurisdiction based on failure to exhaust administrative remedies, a jurisdictional prerequisite to suit.

B.      Disparate Treatment Based on Race, Color

        Title VII forbids employment discrimination on the basis of race. 42 U.S.C. § 2000e–2(a)(1).  Without direct evidence of race discrimination, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green* applies to Ms. Paige's claim for disparate treatment based on race and color.  411 U.S. 792 (1973).  *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("the Supreme Court has established a three-step burden-shifting framework for determining whether a plaintiff's circumstantial evidence of race discrimination raises an inference of invidious discriminatory intent sufficient to survive summary judgment").  Under this analysis, a plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Id.*  If a plaintiff meets the prima facie burden, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its employment decision.  *Id.*  If the employer presents a non-discriminatory reason for its action, the burden shifts to the plaintiff to present evidence that the employer's stated reason for its action is a pretext for discrimination.  *Id.*

        To establish a prima facie case of discrimination, Ms. Paige must establish that:

16

(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181-82 (10th Cir. 2002) (modifying the four-part *McDonnell Douglas* test for claims that do not involve hiring or firing).  *See also E.E.O.C. v. PVNF, L..L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (same) (citing *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim, and the nature of the adverse employment action alleged.")).

1.     2006 Mid-Year Progress Review, OIP/PIP, and PIP

In July 2006, during a mid-year review, Ms. Loftus notified Ms. Paige that her performance was "Unacceptable" in two elements, and "Marginally Successful" in two other elements.  On August 15, 2006, Ms. Paige was placed on a 60-day OIP/PIP based on these mid-year review ratings.  On September 15, 2006, Ms. Paige was taken off the 60-day OIP/PIP because her performance had improved regarding three of the four elements.  On October 4, 2006, Ms. Paige was placed on a PIP to improve her performance regarding the fourth element.  Ms. Paige successfully completed the PIP and received a final rating of "Fully Successful" on her next performance appraisal.

First, Ms. Paige is a member of a protected class, African-American.  Second, to establish adverse employment action, a plaintiff must show that the defendant's conduct caused a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing

17

a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192,1203 (10th Cir. 2007)

(citing *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004)).  While the Tenth

Circuit liberally defines "adverse employment action," it excludes actions "that merely

have a *de minimis* impact."  *Hillig*, 381 F.3d at 1032-33.  "Mere inconvenience or an

alteration of job responsibilities . . . will not constitute an adverse employment action."

*White v. Schafer*, 738 F. Supp. 2d 1121, 1134 (D. Colo. 2010).

The mid-term progress review, OIP/PIP, and PIP were not adverse employment

actions.  *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224 (10th Cir.

2006) (placement on PIP was not adverse employment action where not accompanied

by any immediate effect on employment status);  *Bacon v. Honda of America Mfg., Inc.*,

192 Fed.Appx. 337, 343 (6th Cir. 2006) (noting that PIPs, "do not, on their own,

generally qualify as adverse employment actions") (citation omitted).  The mid-year

progress review only serves to put the employee on notice of his/her performance, thus

affording the employee an opportunity to improve performance where needed.  Ms.

Paige was not demoted, terminated, or subjected to any reduction in pay or benefits as

a result of the mid-year progress review, the OIP/PIP, or the PIP.  (*See* Doc.# 111-1 at

¶ 5).  There was no adverse action because there was no significant change in

employment status.  *Piercy*, 480 F.3d at 1203.  To the extent that Ms. Paige argues that

the OIP/PIP was an adverse action because it placed her at risk of termination (*see*

Doc. # 122, Exh. 17at p. 33), because the possibility of termination "was contingent on

future developments, rather than being a present plan or decision," the OIP/PIP did not

constitute an adverse employment action.  *Agnew v. BASF Corp.*, 286 F.3d 307, 310

(6th Cir. 2002).

Further, even if Ms. Paige established a prima facie case, the evidence does not show that the mid-year progress review, the OIP/PIP, or the PIP constituted pretext for discrimination based on race.  Ms. Paige argues that her past history of positive performance reviews, followed by a drop in 2005, demonstrates a pretext for discrimination based on race, citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002).  The *Garrett* court concluded that evidence of plaintiff's long history of positive performance reviews, followed by a sharp drop, aggregated with evidence of unequal treatment with similarly situated employees, deviations from company policy, and reliance on wholly subjective evaluations "presented a genuine issue of material fact on the question of pretext."  305 F.3d at 1218.  The evidence in the instant case, however, fails to support a finding of pretext based on the mid-year progress review, the OIP/PIP, or the PIP.

Ms. Paige acknowledges that one of the grounds for the mid-year review rating and the OIP/PIP was her late responses to correspondence.  Ms. Paige argues that her "peers were also late in responding to correspondence but they were treated more favorably."  (*See* Doc. # 122 at p. 24-25 of 36).  The evidence does not support Ms. Paige's conclusory argument.  The OIP/PIP was based on numerous specific late responses.  (*See* Doc. # 122, Exhibit 24).  Ms. Paige provides two summary reports regarding the timeliness of work product from her department.  (*See* Doc. # 122, Exhs. 25, 26).  Ms. Paige provides no information as to the relative complexity of the assignments, the number of assignments for which other employees were responsible, when the assignments were given to each other employee, or any other mitigating circumstances.  (*See, e.g.,* Doc. # 109, Exh. 3 at 109-11).  Ms. Paige submits evidence

19

that the Approval/Recertification/Review Tacking System (AARTS) had limitations and did not always reflect accurate information, due in part to a lack of systematic data input.  (*See* Doc. # 122, Exh. 33).  Ms. Paige offers evidence that "AARTS data did not show who spent how much time with the file . . ." and that the Denver Homeownership Center submitted some cases that were filled with many simple errors and mistakes that should have easily been caught during the review process at the Homeownership Center."  (*See id.*).  As this evidence does not tie the errors to any individual, it is of little to no value in supporting Ms. Paige's argument of pretext.  To the extent that Ms. Paige argues discrepancies as to whether she was in possession of the tardy correspondence (*see* Doc. # 122, Exh. 1 at ¶ 9), the same argument would apply to other employees' late correspondence.  The ARRTS evidence confirms that errors were coming from Ms. Paige's department.  Ms. Baker did not rely on the ARRTS reports alone, reviewing also the underlying files that were referenced in the reports.  (*See* Doc. # 109 at 71-73).

In addition to late correspondence, the OIP/PIP details Ms. Paige's many problems with "required revisions to correspondence," and other errors.  (*See* Doc. # 122, Exh. 24).  There is no evidence that other employees suffered the same extent of deficiencies in their work.  Ms. Paige argues that correspondence from Ms. Loftus had "deficiencies even more egregious than the alleged deficiencies Ms. Paige was criticized for," submitting a document that appears to contain corrections.  (*See* Doc. # 122 at p. 26 of 36;  Doc. # 122, Exh. 35).  This document, presented without explanation of the notations, does not establish that Defendant's reasons for Ms. Paige's mid-year review rating, OIP/PIP, or PIP were pretexts for racial discrimination.

Ms. Paige argues that she was unfairly targeted and that work done by her peers

20

was not subject to the same criticisms as her work. (*See* Doc. # 122 at p. 27 of 36).  To confirm her belief, Ms. Paige copied "**verbatim**" some of her peers' work and submitted it for review. (*See* Doc. # 122 at p. 27 of 36 (emphasis in original); Exh. 1 at ¶ 8).  Aside from whether plagiarizing her coworkers' work and submitting it as her own work as a ruse was a responsible use of work time, the court notes that Ms. Paige produces purported evidence of corrections unfairly made to her work and not to others' work. (*See* Doc. # 109, Exhs. 9, 22, 44).  Ms. Paige provides no explanation of the markings and comments on the documents.  The court cannot discern differences in the suggested corrections to Ms. Paige's work versus others' work.  Ms. Paige's allegation that she was targeted is based only on conclusory generalities rather than facts.

Ms. Paige argues that she was the only employee for whose late work product Ms. Baker created a spreadsheet.  Ms. Baker utilized the spreadsheet to illustrate a pattern of late reviews that did not have mitigating circumstances. (*See* Doc. # 122, Exh. 14 at pp. 61-62;  Doc. # 109, Exh. 3 at 59-61 of 124).  Ms. Paige demonstrates no similar pattern among the other employees in her department.  While Ms. Paige states that "Baker through my acting supervisors began to 'nit-pick' my performance" (*see* Doc. # 122, Exh. 1 at ¶ 5), she has not shown that but for her race this scrutiny of her work would not have occurred.  Ms. Paige has not shown that the alleged acts of disparate treatment were based on her race rather than her job performance.  There is no evidence that Ms. Paige was treated more harshly than any other employee performing unacceptably.

Ms. Paige argues that Ms. Loftus "substituted her judgment" by changing Mr. Neff's rating of her performance to a lower rating for her mid-year review. (*See* Doc. #

122 at p. 29 of 36).   After Mr. Neff became Acting Branch Chief, he noted many instances where Ms. Paige's "work product failed to rise to the level of 'Fully Successful,'" such as "failure to compose literate correspondence that related to citations of technical findings of mortgagee errors discovered in cases assigned to her for review, . . . missed deadlines," failure "to proofread or edit her work in even a cursory manner," and grammatical and substantive issues.  (*See* Doc. # 96-3 at ¶ 5;  Doc. # 122, Exh. 17 at pp. 14-15, 32).   While Mr. Neff did not recommend an "Unacceptable" rating on any of the elements in the mid-year review, he rated at least two elements as "Marginally Successful."  (*See* Doc. # 122, Exh. 17).   The evidence shows that, rather than Ms. Loftus overriding Mr. Neff's judgment, Mr. Neff concurred with Ms. Baker and Ms. Loftus in Ms. Paige's mid-year review ratings.  (*See* Doc. # 122, Exh. 17 at p. 31; Exh. 16 at pp. 53-55;  Exh. 15 at pp. 69-70).

Ms. Paige has conceded her argument that the OIP/PIP was not implemented in conformance with the agency procedures.  (*See* Doc. # 134 at ¶ 3;  Doc. # 3122 at pp. 29-30 of 36).   Ms. Paige also argues that the mid-year review and OIP/PIOP were based on wholly subjective criteria.   "[S]ubjective evaluation methods" with no explanation or supporting basis may sometimes be viewed with "skepticism" and, under certain circumstances, can be "susceptib[le] to discriminatory abuse."  *Garrett*, 305 F.3d at 1218.   First, the evidence of Ms. Paige's work product is not wholly subjective.  (*See, e.g.*, Doc. # 96-1 at pp. 5-22 of 22;  Doc. # 122, Exh. 14 at p. 62).   *See Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1200 (10th Cir. 2008) (spreadsheet set out objective criteria).   The deficiencies of Ms. Paige's performance were noted by multiple supervisors.  (*See* Doc. # 96-1 at p. 4 of 22, ¶ 21;  Doc. # 32 at p. 8 of 11).

Further, the mere fact that an employer uses some subjective criteria to make employment decisions does not demonstrate pretext. *Manning v. Chevron Chemical Co., Inc.*, 332 F.3d 874, 882 (5th Cir. 2003). "Reasons such as . . . the failure to accept problems within her responsibility, untimely completion of assignments, and poor communication are legitimate non-discriminatory reasons" for an employment decision. *Brown v. Ohio State University*, 616 F. Supp. 740, 751 (S.D. Ohio 2009) (citations omitted). "[S]ubjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one." *Id.* Even if some of the Defendant's proffered reasons may be considered subjective, Ms. Paige does not demonstrate that these reasons are merely pretext for racial discrimination and not the actual legitimate, non-discriminatory reasons behind Defendant's employment decisions. *See Daniels v. Board of Educ. of Ravenna City School District*, 805 F.2d 203, 208 (6th Cir. 1986) ("the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case.") (citation omitted).

Ms. Paige's mid-year progress review rating was developed from input of several supervisors and accurately reflected her performance as evaluated by those supervisors. (*See* Docs. # 96-1, # 96-2, # 96-3, # 96-4, # 96-5, # 96-6, # 122, Exhs. 14, 15, 16, 17). Ms. Paige's work lacked clarity, required extensive revisions, and was frequently untimely. (*See id.*). Agency policy dictates that an employee who receives one or more "Marginally Successful" performance ratings in a mid-year progress review be placed on a PIP and that an employee who receives one or more "Unacceptable" ratings in a mid-year progress review be placed on an OIP/PIP. (*See* Doc. # 96-1 at ¶¶

23

11-12, 16;  Doc. # 96-4 at ¶¶ 4-6).  When assessing pretext, courts look to the facts as they appear to the management official.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001).  It is the manager's perception of the employee's performance that is relevant, not the employee's subjective evaluation of her own performance.  *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987-88 (10th Cir. 1996).

In sum, the court concludes that Ms. Paige has not presented evidence to establish the elements of a prima facie case of discrimination based on the 2006 mid-year progress review, OIP/PIP, and PIP.  Further, the evidence presented by Ms. Paige is not sufficient to establish pretext for racial discrimination based on the 2006 mid-year progress review, OIP/PIP, and PIP.  The evidence does not demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason."  *Garrett*, 305 F.3d at 1217. Defendant is entitled to summary judgment on Ms. Paige's claim for disparate treatment discrimination based on the mid-term progress review, OIP/PIP, and PIP.

2.     Lower Performance Ratings

Ms. Paige alleges that she received lower performance ratings after Ms. Baker became the Director in April 2004.  On January 31, 2006, Ms. Paige received a "Fully Successful" rating for the period February 1, 2005 through January 31, 2006.  (*See* Doc. # 122, Ex. 10).  For the performance period from February 1, 2006 to September 30, 2006, Ms. Paige's overall Performance Rating was again "Fully Successful."  (*See* Doc.

# 122, Ex. 27).

Defendant argues that Ms. Paige cannot establish a prima facie case on her claim for racial discrimination based on her two "Fully Successful" performance appraisals because her "Fully Successful" performance ratings did not constitute adverse employment action.  Courts in the Tenth Circuit have determined that a performance review that was lower than previous reviews but remained in the satisfactory range does not constitute an adverse employment action.  *See Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994) (concluding that plaintiff who was given a performance review that was lower than previous reviews but remained in the satisfactory range had not presented evidence of an adverse action);  *Brenna v. Salazar*, 2010 WL 582357 * 12 (D. Colo. Feb. 17, 2010) ("Fully Successful" performance appraisal did not constitute a materially adverse employment action as a matter of law;  *Rivera v. Levitt*, 88 F. Supp. 2d 1132, 1144 (D. Colo. 2000) (summary judgment granted on plaintiff's retaliation claim to the extent it was based on performance rating lowered from "Exceeds Fully Satisfactory" to "Fully Satisfactory" that did not constitute an adverse employment action cognizable under Title VII).  *See also Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (stating that "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) (not "every low evaluation or other action by an employer that makes an employee unhappy or resentful" is considered an adverse action).  Ms. Paige has not presented evidence to establish the first element of a prima facie case of race discrimination based on her two "Fully Successful" performance ratings.

Nor does Ms. Paige's allegation that her "Fully Successful" rating resulted in denial of a bonus qualify as an adverse employment action. *See Farrell v. Butler University*, 421 F. 3d 609, 614 (7th Cir. 2005) (the denial of a bonus does not qualify as an adverse employment action) (citation omitted). "[B]onuses generally are sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (loss of a bonus is not an adverse employment action where employee is not automatically entitled to the bonus). There is no evidence in the record that Ms. Paige was guaranteed a bonus, that a bonus bestowed any permanent increase in salary, the amount of the bonus, or that anyone else received a bonus. (*See* Doc. # 122, Exh. 15 at pp. 14-15). Ms. Paige's allegation of a missed bonus is too inchoate to constitute an adverse employment action.

Defendant also argues that Ms. Paige does not establish a triable issue that her two "Fully Successful" performance ratings were a pretext for racial discrimination. There is evidence in the record that four of the five non-Caucasian employees in Ms. Paige's unit received "Outstanding" performance ratings and that four Caucasian employees received ratings below "Outstanding." (*See* Doc. # 111-1 at ¶ 4). Ms. Paige has not presented evidence to establish pretext for racial discrimination based on her two "Fully Successful" performance ratings. The record lacks sufficient evidence to establish that Defendant's reasons for the "Fully Successful" ratings were so inconsistent, implausible, incoherent, or contradictory, that they are unworthy of belief.

*Stover*, 382 F.3d at 1070-71.[2]

3.      Acting Branch Chief and Special Projects

Ms. Paige alleges that she was subjected to disparate treatment based on race

when she was not given the opportunity to serve as Acting Branch Chief and was not

assigned special projects.

> Under the familiar three-step allocation of burdens of proof mandated by
> *McDonnell Douglas*, a plaintiff alleging a failure-to-promote claim must
> initially establish a prima facie case, demonstrating that: (1) she was a
> member of a protected class; (2) she applied for and was qualified for the
> position; (3) despite being qualified she was rejected; and (4) after she
> was rejected, the position was filled.  If the plaintiff carries her burden of
> establishing a prima facie case, the burden shifts to the defendant to
> articulate a legitimate, nondiscriminatory reason for its employment action.
> This shifts the burden back to the plaintiff to proffer evidence that the
> employer's reason is pretextual.

*Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (citations omitted).

Ms. Baker decided to appoint reviewers in the unit who were performing at no

less than the "Highly Successful" level to serve temporary 120-day details as Acting

Branch Chief.  Courts have held that denial of temporary appointments do not rise to the

level of adverse employment action unless accompanied by a tangible change in

employment.  *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) ("Because denial

---

[2]       Furthermore, any claims regarding the 2006, 2005 or 2004 ratings are
time-barred because Ms. Paige did not contact an EEO counselor within 45 days of
receiving the ratings as required by 29 C.F.R. §1614.105(a)(1).  Compliance with the 45
day time requirement is a condition precedent to suit that functions like a statute of
limitations. *Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995).  Ms. Paige has the
burden of establishing compliance with this timeliness requirement.  *Montes v. Vail
Clinic, Inc.*, 497 F.3d at 1167.  Ms. Paige did not contact an EEO counselor until August
2, 2006, which was more than 45 days after she received the ratings in 2004, 2005 and
January 31, 2006.

of . . . temporary designation is not an adverse employment action, mere interference with or delay of such a designation cannot be a cognizable harm under Title VII."); *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997) (temporary designation as acting section head is not contemplated as adverse employment action affecting the terms, conditions, or privileges of employment);  *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987) (no adverse employment action where transfer did not result in loss of salary or benefits).

However, denial of a temporary appointment may constitute an adverse action if it results in a reduction of pay or job responsibilities.  *See Singleton v. Potter*, 402 F. Supp. 2d 12, 40 (D.D.C. 2005) (denial of Plaintiff's request for temporary position could be construed as an adverse employment action if Plaintiff's pay would have been increased);  *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of temporary promotion at a higher rate of pay may constitute an adverse employment action).  There is evidence in the record that one or more of the Acting Branch Chiefs received a temporary pay raise.  (*See* Doc. # 122, Exh. 17 at p. 6).  The court concludes that Ms. Paige may raise a genuine issue of material fact as to whether she suffered a materially adverse employment action due to her nonselection as Acting Branch Chief.

It is undisputed that Ms. Paige did not convey to Ms. Baker her desire to be appointed as Acting Branch Chief.  Mr. Neff and Ms. Loftus both received "Outstanding" ratings, and Mr. Denton received a "Highly Successful" rating.  Ms. Paige was not eligible to serve as Acting Branch Chief because she was performing below the "Highly Successful" level.  Ms. Arlene Nettles, an African-American female, received an "Outstanding" rating but did not serve as Acting Branch Chief.  Ms. Paige challenges the

legitimacy of Mr. Denton's performance ratings by arguing that although Mr. Denton's statistical summary reports were inferior to hers (*see* Doc. # 122, Exhs. 25, 26), she received a "Fully Successful" rating and was placed on an OIP/PIP while Mr. Denton received an "Outstanding" rating and was appointed Acting Branch Chief from September 25, 2006 through November 10, 2006.  As Ms. Paige herself points out and the court has already noted, the statistical summary reports did not accurately reflect the relative complexity of the assignments, the number of assignments for which each employee was responsible, when the work was assigned, or any other mitigating circumstances.  (*See* Doc. # 122 at 28 of 36;  Doc. # 109, Exh. 3 at 57-58).  Ms. Paige's argument that the "system was not reliable for tracking who was responsible for late correspondence" (*see id.*) would also apply to her allegation that Mr. Denton's work was late more than her work was late.  Ms. Paige presents some examples of Mr. Denton's work and her work that do not demonstrate her work was superior or more timely.  Ms. Paige's comparison of her work product to Mr. Denton's work product is conclusory and not supported by probative evidence.  The evidence Ms. Paige presents to the court does not establish that the selection of Acting Branch Chiefs from employees who had received at least a "Highly Successful" rating was a pretext Ms. Paige's race rather than a legitimate nondiscriminatory reason.  Ms. Paige fails to carry her burden to establish a prima facie case or prove that Defendant's articulated legitimate, nondiscriminatory reason for the employment decision is a pretext for race discrimination.[3]

---

[3]     This claim is also time-barred as to the appointments of Mr. Neff as Acting Branch Chief as of February 27, 2006 and Ms. Loftus as the Acting Branch Chief as of May 28, 2006 because Ms. Paige did not contact an EEO counselor within 45 days of February 27, 2006 or May 28, 2006, the dates they commenced in the position.

As to assignment of special projects, Ms. Paige does not refute that she did not ask to be assigned any special projects. (*See* Doc. # 96-1 at ¶ 10). The only employee with a special project at that time had volunteered for it. (*See* Doc. # 109, Exh. 3 at 56). Ms. Paige does not identify any special projects that she could have been assigned. There is some evidence that Ms. Paige received a special assignment in October 2006. (*See* Doc. # 122, Exh. 32 at p. 6 of 11). Plus, failure to assign her additional special projects was not an adverse action. *See Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004) (nonselection for special assignment not adverse employment action as it did not have significant affect on employment status); *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 30 (D.D.C. 2005) (alleged lack of quantity and quality in assignments had no causal impact on employment status). Moreover, given the fact that Ms. Paige was not performing her regular job adequately, "it is perhaps unsurprising" that she was not assigned additional projects. *Moore*, 401 F. Supp. 2d at 28. Ms. Paige has not demonstrated that the failure to assign her special projects is an adverse action or a pretext for racial discrimination.

4.    Religious Compensatory Leave

Ms. Paige alleges that Defendant failed to accommodate her religious beliefs in connection with her requests for compensatory time to celebrate Kwanzaa. In February 2007, Ms. Paige requested religious compensatory time off for April 5 and 6, 2007. (*See* Doc. # 122, Exh. 9; Doc. # 96-6 at ¶ 5; Doc. # 122, Exh. 15 at p. 16). On March 15, 2007, Mr. Depew sent Ms. Paige an e-mail notifying her that she had earned an insufficient number of compensatory time hours, and that she needed to ensure she

worked the requisite number of hours prior to April 5 and 6.  (*See* Doc. # 96-6 at ¶ 6; Doc. # 122, Exh. 20).  On March 16, 2007, Mr. Depew advised Plaintiff that the Agency's religious compensatory time policy actually allowed for hours to be accrued 13 pay periods before and 13 pay periods after their use, so she did not have to earn more hours prior to April 5.  (*See* Doc. # 96-6 at ¶¶ 8, 9).  Mr. Depew approved 16 hours of compensatory leave on March 30, 2007.  (*See* Doc. # 96-6 at p. 2 of 8, ¶ 7, pp. 4-6 of 8).

"Title VII makes it 'an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion.'"  *Thomas v. National Assn' of Letter Carriers*, 225 F.3d 1149, 1154-55 (10th Cir. 2000) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "'Religion' is defined to include only those 'aspects of religious observance and practice' that an employer is able to 'reasonably accommodate . . . without undue hardship on the conduct of the employer's business.'"  *Id.* (quoting 42 U.S.C. § 2000e(j)).

"In the summary judgment context, we apply the principles outlined . . . through the familiar burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Thomas*, 225 F.3d at 115.  "To survive summary judgment on a religious discrimination claim of failure to accommodate, the employee initially bears the burden of production with respect to a prima facie case."  *Id.*  "The employee must show that (1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed his or her employer of this belief; and (3) he or she was fired for failure to comply with the

31

conflicting employment requirement." *Id.* (citation omitted).

Ms. Paige has not established a prima facie case of religious discrimination. First, she has not demonstrated that Kwanzaa is a bona fide religious belief.  Ms. Paige does not cite and the court has not located any legal authority that Kwanzaa is a bona fide religious belief.  *See Skoros v. City of New York*, 437 F.3d 1, *5  n. 2 (2d Cir. 2006) ("Kwanzaa, which, in Swahili, means 'first fruits of the harvest, is a nonreligious holiday created in 1966 to celebrate African–American family and social values.") (citations omitted);  *Sechler v. State College Area School District*, 121 F. Supp. 2d 439, 441 n. 3 (M.D. Pa. 2000) ("Whether Kwanzaa, an African-American holiday patterned after African harvest festivals, is celebrated as a religious event is a debatable point."); *Clever v. Cherry Hill Tp. Bd. of Educ.*, 838 F. Supp. 929, 950 (D.N.J. 1993) ("Kwanzaa, which begins on December 26 and lasts until January 1, is an African-American holiday that celebrates family life and African-American traditions. The name Kwanzaa means "the first" or "the first fruits of the harvest."  Fruits and vegetables are often part of holiday meals because Kwanzaa is based on the harvest festivals of Africa.  An important message of Kwanzaa is education. The holiday teaches respect for the family and community, and for learning and sharing African-American traditions and achievements.").  (*See also* Doc. # 109, Exhs. 17, 49).

Nor has Ms. Paige demonstrated that she was disadvantaged in any way with regard to her requests for compensatory leave to celebrate Kwanzaa.  She was permitted to take compensatory leave to celebrate Kwanzaa.  Neither in her written Response nor in oral argument has Ms. Paige addressed Defendant's Motion regarding her religious accommodation claim.  As the non-movant bearing the burden of proof at

trial, Ms. Paige has failed to "point to specific evidence establishing a genuine issue of material fact with regard to each challenged element" of her religious accommodation claim. *See Allen*, 2011 WL 2174424 at *2. Defendant is entitled to summary judgment on Ms. Paige's religious accommodation claim.

5.      Offensive Communication and Informal Meetings

Ms. Paige also bases her racial discrimination claim on Mr. Depew's e-mail in response to her inquiry about why he copied Ms. Baker on an e-mail. (*See* Doc. # 96-6 at ¶¶ 10, 11 and 7-8 of 8). Even if Mr. Depew's e-mail could be considered curt or rude, this allegation does not raise an adverse employment action. *See Webb v. Cardiotoracic Surgery Assocs. of N. Tex.*, 139 F.3d 532, 540 (5th Cir. 1998) (holding that rude and uncivil treatment is not an adverse employment action), *overruled on other grounds by Burlington N. And Santa Fe Ry.*, 548 U.S. at 66; *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563–64 (insensitive and rude behavior, along with "cold-shouldering," do not rise to the level of an adverse employment action); *Somoza v. University of Denver*, 2006 WL 2535092 * 8 (D. Colo. Aug. 31, 2006) (that Department colleagues were rude to plaintiff during Department meeting insufficient to establish material factual dispute about whether plaintiff suffered an adverse employment action). Further, Ms. Paige presents not a scintilla of evidence that the e-mail was in any way related to her race or discriminatory based on her race.

Ms. Paige also alleges that she was excluded from informal meetings held at coworkers' cubicles. (*See* Doc. # 8 at ¶ 36). However, there is no evidence that Ms. Paige was excluded from formal or informal meetings. (*See* Doc. # 96-1 at ¶ 22). Ms.

Paige has not identified the dates, participants, or subject matter of any formal or informal meetings from which she was excluded. (*See* Doc. # 122, Exh. 1 at ¶7). Ms. Paige's allegation that employees conversed with each other at their cubicles and not at her cubicle does not raise an adverse action and does not create an inference of racial discrimination. Even taking this allegation as true, it constitutes at most the type of "petty slight" that is not actionable under Title VII. *See Burlington Northern*, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms"). To the extent that Ms. Paige's claims for discrimination are based on allegations of rude communications from Mr. Depew and exclusion from conversations, Defendant is entitled to summary judgment.

C.     Retaliation

Ms. Paige also alleges retaliation based on her November 16, 2006 and November 1, 2008 EEO complaints. Title VII forbids retaliation against an employee because she has "opposed" any practice made unlawful by Title VII, or because she has "participated . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Where there is no direct evidence of retaliation, the burden-shifting analysis established in *McDonnell Douglas* also applies to retaliation claims. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1229-30 (10th Cir. 2000). To establish a prima facie claim of retaliation, a plaintiff is required to prove that (1) she engaged in protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there is a causal connection between the protected activity and the adverse employment action. *McGowan v. City of Eufala*, 472

34

F.3d 736, 741 (10th Cir. 2006) (citation omitted).  A materially adverse act is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).  To establish a causal connection, a plaintiff must prove that the adverse employment actions would not have occurred "but for" her protected activity.  *Vialpando v. Johanns*, 619 F. Supp. 2d 1107, 1118 (D. Colo. 2008).  Additionally, when a defendant asserts non-discriminatory reasons for its actions, a plaintiff must also establish that the defendant's reasons are a pretext. *Stover*, 382 F.3d at 1070-71.

First, Ms. Paige engaged in protected Title VII activity by the filing of the November 16, 2006 and November 1, 2008 EEO complaints.  Second, Ms. Paige's allegation of retaliatory treatment based on Mr. Denton's selection as Acting Branch Chief does not raise any adverse employment action that would deter a reasonable employee from engaging in protected activity.  In fact, Ms. Paige was not deterred from engaging in further protected activity.  She filed an EEO Complaint in November 2009, after the actions she complained of in her November 16, 2006 and November 1, 2008 EEO complaints.  *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008) ("the fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable").

Third, Ms. Paige does not demonstrate that her non-selection as Acting Branch Chief in September 2006 when Mr. Denton became Acting Branch Chief would not have occurred "but for" her protected activity.  Ms. Baker determined in early 2006, before

Ms. Paige first contacted an EEO counselor, that the reviewer staff with the highest ratings would be eligible for the Acting Branch Chief position.  Eligibility for Acting Branch Chief based on highest performance ratings is a legitimate non-discriminatory explanation for the selection of the Acting Branch Chiefs.  Ms. Baker was not aware of Ms. Paige's first EEO complaint until August 23, 2006, after Mr. Neff and Ms. Loftus were selected as Acting Branch Chief, but before Mr. Denton was selected.  (*See* Doc. # 122, Exh. 32 at 1).  Ms. Paige attempts to challenge the legitimacy of Mr. Denton's performance ratings.  Mr. Denton received a "Highly Successful" rating on March 8, 2006 and an "Outstanding" rating in every category of his Performance Review in June 2006, before Ms. Paige first contacted an EEO counselor on August 2, 2006.  Mr. Denton's performance ratings are not causally related to Ms. Paige's protected EEO activity.  Ms. Paige's prima facie case of retaliation fails because she is does not establish the requisite adverse action or causal connection with her protected EEO activity.

Nor does Ms. Paige present sufficient evidence to show that the proffered explanation for selection of the Acting Branch Chiefs from employees who had received at least a "Highly Successful" rating was so inconsistent, implausible, incoherent, or contradictory that it is a pretext for discrimination based on her race.  *Stover*, 382 F.3d at 1070-71.  Defendant has not relied on a conclusory assertion that Ms. Paige's performance did not warrant her selection; rather, the decision is supported by detailed examples and explanations of problems with the timeliness and accuracy of Ms. Paige's work.  (*See* Doc. # 96-1 at 5-22 of 22).  Over the period of time she was on the OIP/PIP and PIP, Ms. Paige improved her performance.  Ms. Paige does not contravene the

many deficiencies cited in her performance such that Defendant did not find her to be

the most appropriate candidate for Acting Branch Chief in 2006.  She has not

demonstrated that Defendant's explanation of the Acting Branch Chief selection process

was unworthy of credence.

D.    Hostile Work Environment

The AC alleges seven discrete events that Ms. Paige contends created a hostile

work environment based on race.  (*See* Doc. # 8 at ¶ 24).  "Title VII affords employees

the right to work in an environment free from discriminatory intimidation, ridicule, and

insult."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  To survive summary

judgment on a racially hostile work environment claim, a plaintiff must show a rational

jury could find from the totality of the circumstances: (1) "that the workplace is

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive

working environment," *Stinnett v. Safeway*, Inc., 337 F.3d 1213, 1219 (10th Cir. 2003),

and (2) that the hostility or harassment is based upon the plaintiff's race, *Bolden v. PRC

Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

"A plaintiff does not make a showing of a pervasively hostile work environment by

demonstrating a few isolated incidents of racial enmity . . . ."  *Herrera v. Lufkin Indus.,

Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  The plaintiff must come forward with evidence

from which a rational jury could find that she "was the object of harassment because of"

her race, *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.

1998), or because she engaged in protected activity, *Morris v. Oldham County Fiscal*

*Court*, 201 F.3d 784, 792 (6th Cir. 2000).  The plaintiff must demonstrate that the work environment was hostile under both an objective and subjective standard.  *Witt v. Roadway Express*, 136 F.3d 1424, 1432-33 (10th Cir. 1998).  In considering whether the environment is sufficiently hostile, the court must look at the totality of the circumstances.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Ms. Paige attempts to establish her hostile work environment claim by combining the discrete employment decisions that also form the basis of her disparate treatment and retaliation claims.  Ms. Paige asks the court, in addition to viewing each of the enumerated instances of discrimination as an independent basis for finding that she was treated less favorably on account of her race, to view these discrete events in the aggregate and read the AC as asserting that the sum of the Defendant's discriminatory conduct created a racially hostile work environment.  A plaintiff may aggregate evidence of discriminatory harassment to show a hostile work environment where the evidence is otherwise sufficient to support independent claims.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (permitting aggregation where evidence was otherwise sufficient to support independent claims);  *Hafford v. Seidner*, 183 F.3d 506, 514-15 (6th Cir. 1999) (permitting aggregation where evidence of racial harassment was otherwise sufficient);  *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987) (permitting aggregation).  However, Ms. Paige "cannot so easily bootstrap  alleged retaliatory incidents into a broader hostile work environment claim."  *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005) (citing *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult.")).

Because Ms. Paige relies on discrete acts to support her hostile work environment claim, to the extent that the court lacks subject matter jurisdiction over any discrete acts that were not administratively exhausted, the court cannot consider those acts as part of Ms. Paige's hostile work environment claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (discrete employment acts must be separately exhausted); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (refusing to "mix" time-barred discrete acts with other acts to find a hostile work environment); *Chapman*, 307 Fed. Appx. At * 174 (plaintiff must timely file an administrative charge in order to preserve a claim based on a discrete discriminatory act").

The remaining grounds for Ms. Paige's hostile work environment claim are the very same employment actions she claims are discriminatory and retaliatory. First, the court has determined that the evidence is not sufficient to support Ms. Paige's independent claims of disparate treatment and retaliation. Even if the court were to consider the combined alleged discrete acts, Ms. Paige does not demonstrate racial intimidation, ridicule, insult, or abuse that was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment. "One of the critical inquiries in a hostile environment claim must be the *environment*. Evidence of a general work atmosphere . . . -- as well as evidence of specific hostility directed toward the plaintiff -- is an important factor in evaluating the claim." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987) (emphasis in original). Among the factors appropriately considered are (1) whether the discriminatory conduct is frequent or

severe, (2) whether it is physically threatening or humiliating, or a mere offensive utterance, and (3) whether it unreasonably interferes with an employee's work performance.  *Penry*, 155 F.3d at 1264.  Ms. Paige argues that she experienced hostility in the manner in which her religious compensatory leave request and her complaints about her supervisors' comments were addressed, surveillance, monitoring, and changing her voicemail messages.  (*See* Doc. # 122 at 34 of 36).  There is no evidence that anyone in her workplace made any disparaging comments to Ms. Paige about her race, or made any derogatory or offensive racial comments at all.  Ms. Paige contends that her performance was "stellar" throughout, thus indicating no interference with her performance based on the work environment.  (*See* Doc. # 122, Exh. 1 at ¶ 6).  Nothing in the record suggests that Ms. Paige endured intimidation, ridicule, insult, or other behavior that was offensive, pervasive, severe, or abusive.  Events occurred in Ms. Paige's last years with HUD that made her unhappy. Her performance was critiqued, she was not offered an Acting Branch Chief position, and her supervisors questioned her request for religious compensatory leave before approving it.  But the record in this case is devoid of evidence that Ms. Paige suffered any "discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  *See also Boyd v. Presbyterian Hosp.*, 160 F. Supp. 2d 522, 541-42 (S.D.N.Y. 2001) (holding that while an African-American nurse was subjected to gossip, lower performance evaluation, and intense scrutiny of her work performance that were annoying, bothersome, and stress-inducing, they did not create a racially hostile work environment).

40

Nor does Ms. Paige present any evidence that ties any of the challenged employment decisions to her race.  Ms. Paige's hostile environment claim is based on several negative events that happened in her worklife but she presents absolutely no evidence tying any of these events to her race.  Defendant is entitled to summary judgment on Ms. Paige's hostile work environment claim.

E.    *Weingarten* Claim

Ms. Paige alleges:

Management consisting of Cynthia Loftus, Mich[ael] Depew intentionally and routinely did not allow the plaintiff to obtain representation from the Union during any scheduled meeting with management during the time period of August 14, 2006 through November 1, 2007.  The Plaintiff's right to have representation was denied during the meeting with Michael Depew and Karen Kay Baker concerning Use or Lose leave restriction.  **This policy violated the Weingarten ruling which allows employees to have representation present during any meeting that could have resulted in an adverse action.**  Management when asked if the plaintiff needed representation was told "No", by Michael Depew and Karen Kay Baker.

(*See* Doc. # 8 at 7 of 8, ¶ 39) (emphasis added).  Ms. Paige has not alleged any specific facts regarding the date or the subject matter of any meetings.

In *Nat'l Labor Relations Bd. v. J. Weingarten, Inc.*, the Supreme Court held that the National Labor Relations Act "guarantees an employee's right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres."  420 U.S. 251, 262 (1975).  A violation of "Weingarten rights" constitutes an actionable unfair labor practice in violation of the National Labor Relations Act.  *Id.  See also Black v. Reno*, 2000 WL 37991, at * 9-10 (S.D.N.Y. 2000)

("The alleged denial of union representation at issue in this case is an alleged unfair labor practice.") (citing Federal Service Labor-Management Relations Statute ("FSLMRS"), Title VII of the CSRA, 5 U.S.C. §§ 7114, 7116)).  The FSLMRS, 5 U.S.C. § 7101 et seq., "precludes a federal district court from considering in the first instance unfair labor practices charges directed at federal agencies."  *Black*, 2000 WL 37991, at *9 (citations omitted).  Subject matter jurisdiction may be exercised over a *Weingarten* claim based on a federal agency's alleged unfair labor practices only where the plaintiff has first exhausted his administrative remedies, as "judicial review of such practices is appropriate only after full exhaustion of administrative remedies."  *Id.* (citing *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527 (1989);  *Walsh v. United States*, 588 F. Supp. 523, 526 (N.D.N.Y. 1983)).

While Defendant did not specifically move for summary judgment on this claim, he addressed the claim in his Reply.  (*See* Doc. # 123 at 22-23 of 24).  Ms. Paige did not address or provide any factual or legal support for her purported *Weingarten* claim in either her written Response or in oral argument.  "Federal courts have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party, and thus a court may *sua sponte* raise the question of whether there is subject matter jurisdiction at any stage in the litigation."  *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (internal quotation marks and citation omitted).  Ms. Paige does not allege that she has pursued or fully exhausted her administrative remedies with respect to a *Weingarten* claim.  Accordingly, the allegations in the AC are insufficient to establish subject matter jurisdiction in this court.  *See Black*, 2000 WL 37991, at *9 (citations

omitted).  To the extent Ms. Paige is attempting to assert such a claim, summary judgment is properly granted in favor of Defendant.

Accordingly, IT IS RECOMMENDED that "Defendant's Motion for Summary Judgment . . ." (filed November 10, 2010) (Doc. # 96) be GRANTED and summary judgment on all remaining claims in the Amended Complaint (Doc. # 8) be entered in favor of Defendant and against Plaintiff, with each party to bear her or his own costs and attorney fees.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 1st day of August, 2011.

BY THE COURT:


   s/Craig B. Shaffer
United States Magistrate Judge